JAMES H. BOHNEN *et al.*, Plaintiffs-Appellees, *v.* RICHARD D. WINGEREID *et al.*, Defendants.—(WALTER HARTLIEB, Adm'r of the Estate of Diane Hartlieb, Deceased, *et al.*, Plaintiffs-Appellees and Cross-Appellants; DAVID ECKAUS, Defendant-Appellant.)

First District (3rd Division)   No. 79-186

Opinion filed December 31, 1979.

234

Van Duzer, Gershon, Jordan & Petersen, of Chicago (Louis Gershon and Horace W. Jordan, of counsel), for appellant.

Michael J. McArdle, of Chicago, for appellees James and Janet Bohnen.

Sheldon A. Brenner, of Chicago, for appellee Walter Hartlieb.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

At 8:05 p.m. on December 30, 1973, a 1965 Ford and a 1963 Volkswagen smashed headon into each other in the northbound lanes of Milwaukee Avenue in Chicago. Killed was Diane Hartlieb, 16, a passenger in the Volkswagen. James Bohnen and his sister Janet, driver and passenger in the Volkswagen, were injured. James and Janet Bohnen and the estate of Diane Hartlieb sued Richard Wingereid and David

Eckaus, the occupants of the Ford. Wingereid and Eckaus each denied that he had been the driver. Eckaus in turn counterclaimed against Wingereid, the owner of the Ford. Judgment was entered in favor of the plaintiffs against both of the defendants and against Eckaus on his counterclaim against Wingereid. James Bohnen was awarded $300,000 by the jury, his sister was awarded $48,000 and Diane Hartlieb's estate was awarded $15,000. Eckaus alone appeals from these judgments which we affirm.

The accident occurred on a cold but clear evening; the road was dry. The cars collided about 150 feet north of the intersection of Milwaukee Road and Greenwood Avenue, at a spot where the roadway is six lanes wide, divided by an 8-foot rumble strip median. The Ford, which was southbound in Milwaukee Road, crossed over the median strip into the northbound lanes and struck the Volkswagen, which was northbound on Milwaukee Road.

Nancy Stress Wingereid, who married the defendant after the accident, and Elise Spencer were the first witnesses to arrive on the scene. They were northbound on Milwaukee Road in a car with two friends when they saw the "tail end" of the accident—the two cars spinning to a halt. Their car stopped at the scene and the two girls ran to the Ford. At much the same time, a second car arrived on the scene. One of its passengers, Eric Maki, went into a nearby store and called police. Another, Scott Lindberg, went to the aid of the occupants of the Volkswagen. By the time Maki made it back to the scene a crowd had gathered and police had arrived.

State Trooper Richard Stewart reached the accident 5 minutes after the collision. His testimony established the location of the vehicles. The northbound Volkswagen had been driven backwards 67.3 feet from the point of impact and came to rest facing south in the innermost northbound lane. The southbound Ford ground to a halt in the middle northbound lane 40 feet south of the point of impact. 153 feet of skidmarks led from the southbound lane of Milwaukee Road, across the rumble strip, to the point of impact. Trooper Stewart found Diane Hartlieb, who had been in the passenger's front seat of the Volkswagen, dead. James and Janet Bohnen were extricated from the badly smashed Volkswagen and taken to the hospital. Eckaus and Wingereid had gotten out of the Ford before Trooper Stewart reached the scene. They too went to the hospital for treatment.

At the hospital, the trooper questioned each of the defendants. Wingereid said that he had been a passenger in the Ford. Eckaus, after receiving *Miranda* warnings, declined to speak with Trooper Stewart. The Ford was then taken to a mechanic, who pronounced the car to have been mechanically fit.

At trial, James and Janet Bohnen were each unable to recall what happened immediately before the accident. Janet Bohnen could remember nothing after coming downstairs in her house just before going out. James Bohnen remembered stopping at the light at Greenwood and Milwaukee. He turned right to go northwest on Milwaukee Road, then woke up on the way to the hospital.

Richard Wingereid, who had bought the Ford three days before the accident, said that David Eckaus was driving and that he faintly remembered making the turn south onto Milwaukee before falling asleep. Wingereid woke up in the hospital. Eckaus was the only participant to have a clear recollection of the accident. In his version, however, Wingereid drove the Ford. Eckaus recalled the Ford crossing into the northbound lanes of Milwaukee Road and said that he "hollered" out. He did not hear the Ford's brakes screech, and did not feel the car passing over the rumble strip.

Nancy Stress Wingereid said that she opened the passenger's side door of the Ford immediately after the collision and pulled Wingereid out of the car. Her friend, Elise Spencer, confirmed that Eckaus was on the driver's side of the Ford. Spencer said that Eckaus got out of the driver's side of the Ford immediately after the accident, asking where the blood on his face was coming from.

Appellant Eckaus does not now argue that the jury's verdict finding him liable was erroneous or against the manifest weight of the evidence. Instead, he cites several errors which he claims denied him a fair trial. We will refer to additional testimony to the extent that it is necessary to resolve the issues raised by Eckaus, but we find no reversible error in the record.

First, Eckaus argues that it was error to deny a pretrial motion *in limine* to bar evidence that each defendant had been drinking in the hours before the accident. Because this evidence, which was ruled admissible, was the source of several of the other alleged errors, we will discuss it in some detail.

Wingereid, who was 18 at the time of the accident, and Eckaus, who was 19, had spent much of the afternoon of December 30, 1973, drinking beer. About 11:30 a.m. the two men drove to the Old Mill Tavern in David Eckaus' car. They were at the tavern off and on watching football games on television for at least 6 hours. Neither remembered the outcome of the games. Wingereid testified that he had at least five beers. Eckaus did not remember how much he had to drink, but testified that he was "partially intoxicated." About 7:30 p.m., they drove to a nearby game room to play pinball. There they met two friends who agreed to drive them to Wingereid's house to pick up the Ford. Eckaus' car could not be used because it was nearly out of gas.

When the defendants arrived at Wingereid's house, Wingereid went into the house for about 5 minutes. Eckaus got into the Ford. Wingereid testified that the car was parked in the driveway so that the passenger's side faced the house; Eckaus testified that the car was parked so that the driver's side faced the house. When Wingereid came out of the house he got into the Ford without walking around the car. He said he got in on the passenger's side; Eckaus said it was the driver's side. Eckaus testified that while waiting in the car for Wingereid to come out of the house, he did not have the Ford's key and did not start the car or turn on its heater. The Ford was driven from the Wingereid home to Milwaukee Avenue and the accident followed.

Scott Lindberg's deposition was read at trial. He said that the two men from the Ford were staggering when he saw them at the scene of the accident. Lindberg spoke with one of them, although he was unable to say if it was Wingereid or Eckaus. According to Lindberg, the man's breath was heavy with alcohol. Lindberg thought that the man was "kind of high." Trooper Stewart's accident report stated that there had been drinking involved in the accident but that there was no intoxication.

■■ Drinking should affect the outcome of a case only to the extent that it impairs the drinker's faculties and so worsens his driving. Such results are common; but no arithmetic calculation from the drinks consumed can establish whether a particular person was impaired. (*Kitten v. Stodden* (1966), 76 Ill. App. 2d 177, 181-82, 221 N.E.2d 511, 514.) Because the fact of drinking is highly prejudicial, a rule has developed that evidence of drinking is inadmissible unless more than mere drinking is shown. (*Shore v. Turman* (1965), 63 Ill. App. 2d 315, 323, 210 N.E.2d 232, 235-36.) A plaintiff must bolster the probative value of the drinking with other evidence of the next step in the chain of causation, namely, actual impairment of physical or mental capabilities so as to diminish the defendant's ability to act with due care. (*Shore v. Turman* (1965), 63 Ill. App. 2d 315, 322-23.) In short, intoxication.

The impairment can be shown directly, through the testimony of the person who was drinking, or circumstantially, either through the opinion testimony of one who observed the person who was drinking to the effect that he was intoxicated (*Allison v. Davies* (1978), 64 Ill. App. 3d 900, 381 N.E.2d 1034), or through evidence of erratic behavior on the part of the drinker (*McCullough v. McTavish* (1978), 62 Ill. App. 3d 1041, 379 N.E.2d 890). Bizarre or unusual driving patterns can be circumstantial evidence of impairment. *Felker v. Bartelme* (1970), 124 Ill. App. 2d 43, 260 N.E.2d 74.

■■■ There was evidence in this case of impairment. The evidence was direct, consisting of Eckaus' own testimony that he and his friend had been drinking and that he was "partially intoxicated." It was also

circumstantial, consisting of Scott Lindberg's opinion that one of the men from the Ford was "kind of high," and the fact that the Ford, with no apparent explanation, crossed over two lanes of traffic and an 8-foot rumble strip to collide headon with an oncoming car. (*Cf. Young v. Gateway Transportation Co.* (1975), 26 Ill. App. 3d 864, 326 N.E.2d 222; *Weiner v. Trasatti* (1974), 19 Ill. App. 3d 240, 311 N.E.2d 313; *Felker v. Bartelme* (1970), 124 Ill. App. 2d 43, 260 N.E.2d 74.) The evidence having shown this unusual driving pattern, it was also proper to admit evidence of drinking to support the plaintiff's claim of negligence. (*Savitch v. Allman* (1977), 52 Ill. App. 3d 884, 888, 368 N.E.2d 224, 227; *Clarke v. Rochford* (1967), 79 Ill. App. 2d 336, 340, 224 N.E.2d 679, 682.) The trial court properly rejected the defendant's motion *in limine.*

■■ At the hearing on the motion *in limine*, counsel for James and Janet Bohnen said that he expected a "bouncer" from the Old Mill Tavern to testify that he ejected Eckaus and Wingereid from the tavern two hours before the accident because they were, in his opinion, intoxicated. Such opinion testimony would have been sufficient circumstantial evidence of impairment by itself to justify rejecting the motion *in limine.* However, the "bouncer" did not testify at trial, and Eckaus argues that without his opinion testimony the plaintiffs failed to lay the proper foundation for the introduction of evidence regarding drinking. We do not approve of the practice of using one piece of evidence as a foundation in asserting admissibility before trial, but then laying the foundation in a different manner at trial. However, the failure of the plaintiffs to call the "bouncer," who was present in the courtroom at trial, as their witness does not taint the ruling on the motion *in limine*, because the other evidence laid a proper foundation for the admission of the evidence of drinking.

■■ Eckaus contends that an instruction given to the jurors that they could consider intoxication, and that it would not be an excuse for negligence (Illinois Pattern Jury Instructions, Civil, No. 12.01 (2d ed. 1971) (hereinafter IPI)) was also error, in that there was no evidence of intoxication. As set forth above, there was evidence of drinking and erratic behavior from which the jury could conclude that the driver of the Ford was intoxicated. It was not, therefore, error to give the instruction.

■■■ Eckaus also argues error because of the failure to give IPI Civil No. 150.15. That instruction, the only pattern instruction that defines intoxication, was designed for dram-shop actions. There is some authority to suggest that it should be given in a negligence action involving intoxication (*French v. City of Springfield* (1972), 5 Ill. App. 3d 368, 283 N.E.2d 18); but we believe it should not. As the jury was instructed, intoxication as such has no legal effect; the jury is simply to consider all the facts and circumstances, including intoxication, in deciding the issue of due care. (See IPI Civil No. 12.01.) A definition of intoxication is

unnecessary and would emphasize the subject unduly. Moreover, a party cannot complain of the failure to give an instruction unless the party tenders that instruction to the trial court and requests that it be given. (Ill. Rev. Stat. 1977, ch. 110A, par. 366(b)(2)(i); *McCullough v. McTavish* (1978), 62 Ill. App. 3d 1041, 1045, 379 N.E.2d 890, 894.) Eckaus did not tender IPI Civil No. 150.15 at trial, and is thus precluded from complaining about its absence.

The next point raised by Eckaus concerns the plaintiffs' negligent entrustment theory. At the close of the testimony at trial, the plaintiffs were allowed, over Eckaus' objection, to amend their complaints to allege alternatively that Wingereid was negligent, as the owner of the Ford, in entrusting it to Eckaus, whom he knew to be intoxicated. Eckaus objected to the instruction given to the jury on negligent entrustment, arguing that the instruction gave the jury the option of not resolving the difficult question of who was driving the Ford but simply ignoring the legal theories and finding both defendants liable. Eckaus claims that there was no evidence to support a theory of negligent entrustment; and he argues instructing the jury on that theory was error.

■■ It appears from the record that at the time Wingereid entrusted his Ford to Eckaus he knew the latter had been drinking but had not been given a clue that Eckaus' capabilities had become impaired. Eckaus had driven his own car from the tavern to the pinball game room without noticeable difficulty. It is true that entrusting a car to a driver whom the owner knows or should know is intoxicated constitutes negligent entrustment. (*Giers v. Anten* (1978), 68 Ill. App. 3d 535, 386 N.E.2d 82.) Perhaps it may even be unreasonable for the owner of a car to entrust it to a driver whom the owner only knows has been drinking. But even assuming *arguendo* that it is not and that Wingereid did nothing unreasonable in entrusting his car to his drinking companion, any error in instructing the jury on a theory of liability not supported by the evidence did not harm Eckaus, the sole appellant here. He claims that the negligent entrustment theory enabled the jury to avoid deciding who drove the Ford. It did not. That decision was forced upon them, apart from the negligent entrustment theory, by Eckaus' counterclaim against Wingereid. With or without plaintiffs' entrustment theory, the jury would have had to decide who drove the Ford to determine whether Eckaus could recover damages from Wingereid. In any case, we decline to assume that the jury willfully abandoned its instruction to base its verdict on the law and the evidence. The possibly erroneous instruction to the jury on negligent entrustment did not harm Eckaus, and is not a ground for reversing the judgments against him.

■ Eckaus also contends the trial judge erred by refusing to give his tendered instruction on the presumption that the owner of a car is

its driver. That presumption is accepted in Illinois, but it is rebuttable. (*Robinson v. Workman* (1956), 9 Ill. 2d 420, 427, 137 N.E.2d 804, 808.) Thus, it puts the burden of production on the party against whom it is invoked. The owner of the car must bring forth some evidence to show that someone else was, in fact, driving the car. (*McElroy v. Force* (1967), 38 Ill. 2d 528, 532, 232 N.E.2d 708, 710.) Once some evidence is produced, the effect of the presumption is eliminated and only the evidence offered by the parties is considered in reaching the fact-finder's verdict. In such cases, the jury should not be instructed on the presumption. (*Diederich v. Walters* (1976), 65 Ill. 2d 95, 100-03, 106, 357 N.E.2d 1128, 1132.) Once there was evidence in this case that Eckaus was the driver, and such evidence was present in the testimony of Wingereid, Nancy Stress Wingereid and Elise Spencer, the presumption ceased to have any effect. To instruct the jury on the presumption would be to order it to give weight to the fact that Wingereid was the owner of the car in determining who drove it. Such weight would be error, and a verdict produced after such an instruction would be tainted. The trial court was correct in refusing the instruction.

■■ Another point raised by Eckaus is similar to one already discussed. He argues error in the giving of a non-IPI instruction on the responsibility of the owner of the car to use due care at all times in its operation. Eckaus was clearly not the owner of the Ford. The instruction had no effect on him and he does not urge any. Even if the instruction was improper, it was not prejudicial to Eckaus and does not require reversal of the judgments against him.

■■ Finally, Eckaus argues that the award to James Bohnen was excessive. Bohnen suffered extensive physical injuries, resulting in disability and disfigurement. A partial list of his injuries includes fractures of his jaw, teeth, hand, wrist, both knees, ankle, both legs and his hip. He had a life expectancy of 37 years and was unable to put in a full week of work as a carpenter following his accident. He was saddled with recurring pain and suffering and unpaid medical bills of nearly $35,000. The verdict of $300,000 was not against the manifest weight of the evidence and will not be disturbed.

■■ Two additional issues arose because of the cross-appeals of Janet Bohnen and the estate of Diane Hartlieb. Neither requires reversal, but each deserves mention. Janet Bohnen complains that a doctor who treated her and whose testimony was important in establishing the full extent of her injuries refused to respond to Janet's subpoena. The doctor finally appeared in court, but only long after the proofs had closed. In oral argument, counsel for Janet Bohnen asked this court either to directly penalize the doctor or lay down guidelines for trial courts to follow in similar situations. Janet Bohnen did not, however, request a continuance

in the trial when the recalcitrant doctor balked at responding to the subpoena. She now seeks only to reopen the question of damages. Our opinion is that the doctor's misconduct should not result in a new trial on damages inasmuch as Janet Bohnen did not request a continuance to insure his presence at trial.

■■ Finally, the representatives of Diane Hartlieb have asked for a new trial on the issue of damages because of an insufficient award. The amount of damages in a wrongful death action cannot be determined with mathematical certainty, and is largely within the discretion of the jury. (*Naslund v. Watts* (1967), 80 Ill. App. 2d 464, 474, 224 N.E.2d 474, 479.) Verdicts supported by the evidence will not lightly be reversed. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 238, 242 N.E.2d 237, 240.) The loss of a young woman so obviously talented, so clearly beloved and with such a bright future before her was a tragedy of the highest order. But a wrongful death action is a creation of the legislature, not of the common law, and it does not recompense a grieving family for the lost love, friendship and charm of such a girl as Diane Hartlieb. Only the economic contributions to her family that she could be expected to make could be recovered from those responsible in law for her death. (Ill. Rev. Stat. 1977, ch. 70, par. 2.) Perhaps this law is heartless and perhaps it should be changed. But, that would be a matter for the legislature.

● 17, 18  The evidence here showed that Diane Hartlieb worked part-time while attending school, sewed much of her own and her family's wardrobe, and contributed generously to her parents and family. In addition, a rebuttable presumption arises under Illinois law that the decedent's death resulted in a substantial pecuniary loss to the lineal heirs. That presumption was confirmed by the evidence in this case, and was not rebutted by the defendants. But the award of $15,000 was not so small as to be insufficient as a matter of law. It must be affirmed.

No prejudicial errors were committed at trial. The judgments of the trial court are affirmed.

Judgments affirmed.

McNAMARA and McGILLICUDDY, JJ., concur.