DORIS WALTERS, Adm'r of the Estate of Charles Walters, Deceased, Plaintiff-Appellant, v. LINCOLN ELECTRIC COMPANY, Defendant-Appellee.

First District (4th Division)   No. 1—89—0426

Opinion filed April 26, 1990.

Mullen, Minella & Chase, of Chicago (John C. Mullen and Mary R. Minella, of counsel), for appellant.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Kendal A. Crooks, John P. Prusik, and Russell P. Veldenz, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Doris Walters, administrator of the estate of Charles Walters, filed a wrongful death action against Lincoln Electric Company, based upon a theory of strict liability for design defects in a portable arc welder. Her husband, Charles, was electrocuted in 1979 at his place of employment. Plaintiff alleged that the portable arc welder her husband had touched was defective in design and unreasonably dangerous because it did not contain an external grounding system in the event that the internal system failed. The jury returned a verdict in favor of Lincoln Electric. On appeal, Walters contends that she did not receive a fair trial, on these grounds: (1) defendant's expert violated a motion *in limine* by referring to "OSHA" requirements; (2) plaintiff's closing arguments were improperly curtailed, preventing her from arguing certain matters in evidence; (3) the court erred in refusing to give one of her instructions; and (4) the trial court abused its discretion in admitting evidence that Walters, the widow of the decedent, had remarried, and in barring damages as of the date of her remarriage.

We affirm.

BACKGROUND

Charles Walters was electrocuted on July 27, 1979, while working at Fiat-Allis Manufacturing Plant in Springfield, Illinois. He was driving an earth-scraping vehicle into the plant for repairs when he saw that a portable arc welder was blocking the way. He got off of the vehicle to remove it. When he touched it, he was killed.

Lincoln Electric Company manufactured the arc welder. Plaintiff's theory at trial was that the machine was defective in design and unreasonably dangerous because it did not contain an external grounding system for backup safety in the event its internal grounding system failed. In support, she called Professor Ralph Armington, P.E., to testify that the machine was not grounded at the time of the electrocution. The machine carried a lethal voltage of 480 volts to ground.

According to Armington, the welder should have incorporated an external ground, such as a cable hooked up with an external stud. The cable could be clamped to a water pipe or beam to ground the machine, which would have prevented Walter's death by diverting the lethal charge, resulting in only a blown fuse. Dr. Armington also

stated that the welder should have borne a warning sign directing that the machine should not be turned on until the external ground cable was attached.

Dr. Armington cited some of the ways in which the green ground wire could be made ineffective, such as when a high current gets into the circuitry and melts off the ground wire or when an extension cord with a defective ground wire is used.

Tom Farris, a sales representative and employee of Lincoln Electric, sent a letter to his employer concerning the accident. The information in the letter was supplied by Melton Electric Company, whom Farris had suggested to his employer as the "field service shop" who could investigate the accident. Farris spoke to people from Melton and prepared the letter, in which he repeated Melton's information that the green wire, the one that grounded the welder internally, had become detached and shorted to one of the phase wires, causing the welder to become live electrically. At trial Ferris admitted writing the letter but testified that he did not have personal knowledge that the information contained therein was accurate.

The senior plant engineer of Fiat-Allis, Ralph Oakley, also investigated. He examined the machine, the input cable, and the plug shortly after the accident. He found that Fiat-Allis had connected a Crouse-Hinds plug to the imput cable which was then connected to the arc welder. He found nothing in the welder itself that caused the machine to become electrically live. He did not find anything wrong with the receptacle. However, when he took the Crouse-Hinds plug apart, he noticed that the white wire was cut and unconnected, and that the green cord, the internal ground, had been connected to a current carrying post in the male connector instead of to the grounding boss.

Lincoln Electric expert witnesses testified that the machine was not unreasonably dangerous with only an internal grounding system. If everything is properly connected, the machine is automatically grounded once the machine is plugged in. The witnesses testified as to various problems with an external grounding system. The ultimate user was responsible for connecting the input cables to the welder, and Lincoln shipped the welders without input cables. The machine also carried signs warning the user to be certain that the machine was properly grounded through the internal system and to have an electrician make the proper connections.

On the issue of the widow's damages for loss of society, Walters sought to bar evidence that she had remarried four years after her husband's death. The trial court denied the motion. According to her

offer of proof, the two-year second marriage was disastrous to her because she had depleted her $20,000 savings to pay for her second husband's luxuries, assumed his debts of $10,000, and was forced to take a $30,000 mortgage on her house. Despite her argument that her remarriage should not have extinguished her damages from the death of Charles Walters, the court instructed the jury that her damages were cut off as of the day of the second marriage.

The jury returned a verdict in favor of Lincoln Electric. Following a hearing on plaintiff's post-trial motion for new trial, the trial court issued a written opinion denying that motion.

OPINION

Plaintiff alleges several trial errors that she claims denied her a fair trial.

First, she contends that Lincoln Electric violated an order *in limine* barring reference to the fact that the Occupational Safety and Health Administration (OSHA) had given Fiat-Allis a citation. The court agreed that this evidence should not be revealed to the jury. During the trial, plaintiff's counsel asked the court to warn each witness not to refer to OSHA. During the testimony of Lawrence Bell, one of Lincoln Electric's expert witnesses, the following exchange occurred:

"Q. [Defendant's counsel]: Using Exhibit No. 2, which is Crouse-Hinds plug, would you describe to the jury what you've just been talking about?

A. Yes. This plug which is laid out here, this exhibit, the three boss prongs that you see are the prongs to which the power attaches and is transmitted from the power supply, and when this is plugged into the female portion of the plug, it transmits the power into here through the cable and then into the welder. Normally speaking and properly speaking, according to the National Electric Code and Safety regulations issued by OSHA require—.

[Plaintiff's attorney]: Objection. Objection.

THE COURT: Last portion will be stricken. The jury will disregard."

■ Plaintiff contends that the trial of this case should be reversed because she was prejudiced by this passing reference to OSHA. She believes that the comment "had the effect of telling the jury that Fiat-Allis had violated a mandatory government regulation [and] that this violation by Fiat-Allis, not Lincoln Electric, caused Charles Walters' death."

We do not agree. The mere mention of national safety regulations issued by OSHA in no way tells the jury that OSHA had investigated the matter or issued a citation against Fiat-Allis in this case. The witness was interrupted, the objection immediately sustained, and the jury was instructed to disregard. The sentence fragment in issue does not suggest what the specific OSHA requirements may be, and it is not likely that the jury could infer from the isolated reference to OSHA that a citation was issued in this case. Mr. Bell's opinion that faulty wiring was to blame for the electrocution is one that he likely would hold regardless of the existence of OSHA requirements. In essence, his opinion was that someone had miswired the ground wire in the plug by connecting it to a prong that carried current, a fatal error that caused the frame of the welder to become electrically live when the power was turned on. Therefore, to the extent that this single reference to OSHA violated the order *in limine*, we hold that the error was harmless and does not compel retrial of this cause.

Next, plaintiff charges that because her attorney's closing argument was interrupted with objections when he was commenting upon evidence of record, and the court sustained the objections, she was denied a fair trial. This controversy involves the testimony of her expert witness, Dr. Armington. In summation, plaintiff's counsel was describing the different ways in which the green ground wire could be made ineffective. Dr. Armington had stated that one way was when it was disconnected or misconnected. According to the closing argument comments of plaintiff's counsel, "In other involvements, he found a variety of ways in which it was made ineffective. One of these is where the wire was continuous into the receptacle and then from the receptacle back to the source of power, it was not continuous. He said this could have been because the conduit is dependent upon that for contact and there's a loose fitting in the conduit which is not electrical—."

At this point defense counsel objected on the grounds that there was no evidence supporting this statement. The court sustained the objection.

On a second occasion, plaintiff's counsel was arguing, "it could be because there's an extra wire for the purpose of grounding and that the wire is somewhere discontinuous. That was another—.

[Defendant's counsel]: Further objection."

The transcript of the proceedings reveals that plaintiff's counsel was relating to the jury Dr. Armington's examples of how the ground wire could be made ineffective. Significantly, however, he

never testified that the actual cause of the electrocution was based on any of those other reasons, such as a loose fitting in the conduit or because of a discontinuous wire. Therefore, while counsel's comments were based on statements of record, those statements referred to possibilities, not what actually occurred.

We believe that it would have been preferable to allow counsel broad latitude in repeating Dr. Armington's testimony. Nevertheless, we fail to see how this rises to the level of reversible error. Dr. Armington's opinion was offered in support of the theory that the arc welder was defective as designed, unreasonably unsafe because of the absence of a backup system to ground the machine in the event the internal grounding system failed. In that context, his examples of how the internal ground wire might become ineffective related to the theory that the manufacturer should have foreseen such problems and should have included an external system as part of the design. Such examples were not, however, properly offered to suggest that the electrocution was in fact caused by one of the other ways in which the wire *could* become ineffective. Therefore, the trial court might have believed that the jury would view these examples as other possible causes for the failure of the ground wire in this case, resulting in confusion or a mistaken view of the elements of proof. In fact, the trial court's written opinion after hearing the post-trial motion suggests exactly that. The court noted, "It is true that a wire could be made ineffective in a certain manner. However, there was no testimony adduced at trial supporting an argument that the wire on the grounding machine was in fact made ineffective in any manner that the expert had opined. *** Counsel's commentary was excluded from his argument in order to prevent him from confusing and misleading the jury into believing certain events had occurred when it was only the expert's testimony that these events might have occurred."

The trial court was in the better position to observe the impact of alleged misconduct; that court retains the sound discretion to determine whether the remarks or conduct of counsel interfered with the right to a fair trial. (*Fultz v. Peart* (1986), 144 Ill. App. 3d 364, 494 N.E.2d 212.) Absent a clear abuse of discretion, the reviewing court will not overturn the trial court's determination as to the prejudicial effect of that remark or conduct. (*Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 445 N.E.2d 63.) In the pending case, plaintiff was not prevented from fully presenting her case because, regardless of why the green wire failed, her theory was that the external grounding system would have prevented the electrocution and there-

fore the arc as manufactured was unreasonably dangerous. Moreover, she was able to argue that Melton Electric believed that a wire had come loose and shorted to one of the phase wires, making the welder case hot to ground. We conclude that the trial court did not abuse its discretion in sustaining defendant's objections to the two comments in closing argument.

Plaintiff's third point of error relates to the court's refusal to submit her instruction No. 8, which stated:

"A product may be considered unreasonably dangerous for failure to adopt any and all safety devices, the absence of which would render the product not reasonably safe for its intended use."

The proposed instruction was not an Illinois Pattern Jury Instruction (IPI). Defendant argues that certain other IPI instructions adequately apprised the jury of her theory of the case, including No. 19, which informed the jury of her theory that the portable arc welder was unreasonably dangerous because it was designed and manufactured without an external grounding stud. Illinois Pattern Jury Instructions, Civil, No. 400.01 (3d ed. 1986 Supp.).

■■ The failure to adopt "any and all" safety devices is a broad statement which, in our opinion, overemphasizes plaintiff's position. (*Cf. Drake v. Harrison* (1987), 151 Ill. App. 3d 1082, 1087, 503 N.E.2d 1072.) Because plaintiff's theory was that of a design defect (specifically, the lack of an external grounding system), we do not find that the jury should be invited to speculate on the more general failure to adopt any and all safety devices. (See *Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 858-59, 417 N.E.2d 1099, 1101 (argumentative instructions highlight certain evidence in a partisan manner).) Instruction No. 19 adequately set forth the basis of her position and, along with the other instructions given, properly instructed the jury.

We conclude that plaintiff was not denied a fair trial. The jury was not hampered in considering all relevant evidence and law as to the parties' respective positions. On the question of liability, the jury found in favor of Lincoln Electric.

Because the jury did not reach the issue of damages, we do not decide the final issue plaintiff raises, that evidence of her remarriage should have been barred. This is not a case where "errors which go to the question of damages may be so pervasive and prejudicial as to create the likelihood that they may have affected a jury's decision on the issue of liability." (*Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 599-600, 294 N.E.2d 689, 694.) Here, the evidence of her remarriage, four years after Charles' death, was simply irrelevant to

the question of whether the arc welder was unreasonably dangerous, causing Charles' death. We decline to speculate that the jury, on its own, decided that she was not entitled to recover anything, simply because she eventually remarried.

For the foregoing reasons, we affirm the judgment of the trial court on the jury's verdict and the trial court's denial of plaintiff's post-trial motion for new trial.

Affirmed.

McMORROW, P.J., and JOHNSON, J., concur.