CHUBB/HOME INSURANCE COMPANIES, Plaintiff-Appellant and Cross-Appellee, v. OUTBOARD MARINE CORPORATION, Defendant-Appellee and Cross-Appellant.

First District (5th Division)   No. 1—89—3474

Opinion filed November 13, 1992.

Bollinger & Ruberry, of Chicago, and Fell & Spalding, of Philadelphia, Pennsylvania (Stephen R. Bolden, of counsel), for appellants.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and Joshua G. Vincent, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

Kathleen Faul, who was injured by a boat propeller while in the water, filed suit against the boat operator, David Joss (Joss), and the boat owner, his father, John Joss, alleging negligence in the operation and the entrustment of the boat. A settlement was reached between Faul and the Josses. This settlement was paid on behalf of the Josses by their insurance carrier, Chubb/Home Insurance Companies (Chubb). Chubb subsequently brought a contribution action against Outboard Marine Corporation (OMC), manufacturer of the boat's engine. Chubb sought recovery under products liability and negligence theories, alleging that the injuries suffered by Faul would have been much less severe if OMC's motor had been equipped with a propeller guard. A jury returned a verdict finding that OMC was not liable. On appeal, Chubb argues that the trial court erred in denying its motion *in limine* which sought to exclude evidence of the boat operator's con-

sumption of alcohol on the morning of the accident and that remarks made by OMC's counsel during closing arguments constitute reversible error.

FACTS

Except where otherwise indicated, the following facts are undisputed. David Joss, Kathleen Faul and Peggy McElroy, three college friends, made plans to take the Joss family boat out to Cedar Island in Fox Lake and spend the afternoon of July 11, 1981, at the Joss family cottage. They were going to a concert at Alpine Valley that night.

After arriving at the marina, they bought some Bloody Mary mix and loaded the boat, which was powered by a 1973 Evinrude outboard motor made by OMC. Upon arriving at the cottage, Faul went inside and made a round of Bloody Marys. They sat outside for about an hour talking during which time McElroy had two drinks. Joss drank about half of his Bloody Mary from an eight-ounce glass when he put the glass down on an incline and the glass tipped over, spilling the rest of his drink. Joss testified that earlier that morning he ate a breakfast of bacon and eggs prepared by McElroy. McElroy denied preparing any breakfast for Joss. Joss further testified that he did not recall consuming any more alcohol prior to the occurrence in question.

There is further undisputed testimony that between 11 a.m. and 11:30 a.m. Joss, Faul and McElroy got back into the boat. They rode around for about 20 minutes with Joss driving the boat and McElroy and Faul sitting behind the driver. They decided to go water-skiing and went back to the cottage, where Joss readied the water-skiing equipment and everyone changed into their swimsuits.

Joss testified that be began water-skiing at age 11 and first learned to operate a boat at summer camp about the same time. Joss first operated the family boat when he was 18 or 19 years old. He estimated that he operated the boat between 50 and 100 times and that the boat was used for water-skiing between 10% and 20% of that time. Joss had been told by his father to stop the motor completely when talking to a skier.

Faul, who told Joss she knew how to water-ski, was the first to do so that day. She put on a red life vest which clipped together covering her shoulders and extended slightly down past her waist. They were going to ski in a channel which is a couple of hundred yards wide in Meyers Bay, part of Fox Lake. They all discussed the hand signals which would be used to communicate between the skier and

the operator of the boat. McElroy sat in the back of the boat and was to relay Faul's signals to Joss.

McElroy testified that she brought a six-pack of beer with her onto the boat, but did not recall whether Joss consumed any beer while on the boat. She did recall that she consumed one beer on the boat. Joss testified that he did not remember Faul or McElroy bringing beer with them on the boat or consuming any. On cross-examination, Joss was not positive, but stated that he did not remember drinking or being offered a beer while on the boat. Joss said if he did consume any beer, he probably had only one. There was no other testimony to establish that Joss consumed any alcohol other than a portion of a Bloody Mary. McElroy stated that Joss' eyes were not bloodshot, his speech was not slurred, and that he did not appear to be intoxicated or impaired in anyway while operating the boat.

Faul had been skiing for about 20 minutes during which time she fell two or three times. When she last fell, McElroy so advised Joss, who then slowed down the boat and started to make a turn to the left. Joss testified that at the time the boat was going about 10 to 15 miles an hour. McElroy said she was unable to estimate the speed of the boat. Joss was attempting to pick up Faul by heading straight for her. Joss swung the boat to the right with Faul now on the starboard side of the boat. McElroy stated that the boat was slowing gradually while approaching Faul. Joss testified that he started to circle around Faul with the throttle of the boat just short of neutral and the boat going about five miles an hour.

According to Joss, as he started to make the turn he pulled back on the throttle and the front end of the boat moved up in the air because he was turning and slowing down. Joss testified he lost sight of Faul when he caught a wave or a wake. McElroy, however, testified that she did not remember any such wave or wake. The boat drifted over towards Faul and Joss lost sight of her. Joss stated that as soon as he lost sight of her, he pulled completely back on the throttle, putting the boat into neutral. It was then they noticed that Faul was injured, at which time McElroy yelled ashore for people to call paramedics. Joss jumped into the water and helped Faul into the boat.

Kathleen Faul sustained seriously disfiguring and disabling injuries and lacerations, the full extent of which need not be specified for purposes of this appeal. On January 20, 1982, Faul filed suit against David Joss and his father, John Joss. On October 3, 1984, Chubb filed a motion for leave to file a third-party complaint, which was denied by the trial court. On October 10, 1984, a settlement agreement was reached under which Chubb agreed to pay Faul

$2,297,590.86 on behalf of the Josses. Chubb asked for a "release as is the custom within the Circuit Court of Cook County."

On that date, Chubb advised the court that a settlement was reached and renewed its motion for leave to file a third-party complaint against OMC. The court granted Chubb leave to file its contribution claim *instanter*. Thereafter, on October 10, 1984, the third-party complaint was filed, and, on October 12, 1984, an order dismissing Faul's complaint against the Josses was entered.

In its complaint, Chubb sought recovery under products liability and negligence theories. Chubb alleged that Faul would have suffered only minor injuries if OMC had equipped the outboard motor of the boat with a people-protective propeller guard. Chubb further alleged that the severity of Faul's injuries was attributable to the absence of this guard and not to any negligence by Joss in the operation of the boat.

On October 18, 1984, Faul executed a release which purported to discharge the Josses from any liability connected with the July 11, 1981, accident. This release, however, did not provide for the discharge of OMC. OMC moved to dismiss the third-party complaint as untimely and because it failed to state a claim under the Contribution Act since OMC's liability was not extinguished by the release as required by section 2(e) of the Contribution Act. (Ill. Rev. Stat. 1989, ch. 70, par. 302(d).) Chubb filed a motion to reform the release to provide for the discharge of OMC.

In addition, OMC filed a motion for summary judgment with respect to Chubb's motion to reform the release. In support of its motion for summary judgment, OMC filed the depositions of William Cahill, the attorney who represented Faul in the action against the Josses, and Jeremiah Connelly, the attorney who prepared the original release. Cahill's deposition testimony was that Chubb's attorneys never requested that the release include OMC. Cahill stated that he was aware that Chubb attempted to file a third-party complaint against OMC a week before the settlement was reached. Connelly's deposition testimony was that there were no specific discussions of whether the release was to discharge OMC, but that he did make it clear that Chubb wanted to sue OMC. Connelly stated that he intended to add OMC to the release but because he lacked "form" language which would conform with the Contribution Act, he forwarded the release which purported to discharge only the Josses by name.

On April 8, 1986, the trial judge denied OMC's motion for summary judgment and granted Chubb's motion to reform the release to specifically discharge OMC from liability with respect to Faul. OMC's

motion to dismiss the third-party complaint was denied on August 22, 1986.

On July 6, 1989, after this matter was reached for trial, Chubb made an oral motion *in limine* attempting to exclude evidence that Joss, McElroy or Faul had been drinking alcohol on the morning of the accident. This motion was premised on the contention that OMC would be unable to demonstrate that Joss was impaired as a result of any alcohol consumption. The motion was denied. In denying Chubb's motion *in limine*, the trial court stated, "if they don't make out their affirmative defense, [referring to the fact that Joss' intoxication was raised as an affirmative defense in the pleading] I assume there's going to be a motion for a directed verdict on one or more of their affirmative defenses, and the Court will tell the jury, while they've got their notebooks present, 'This one is out,' if they don't establish their defense. But I don't think we can stop them at this time."

OMC also filed a motion *in limine*, attempting to exclude the fact that the attorney who had represented Faul in its action against the Josses had represented OMC on prior occasions. In explaining the reasoning behind his objection to the motion *in limine*, Chubb's counsel stated that he did not want OMC to argue that Kathleen Faul did not join OMC as a defendant in her suit because she did not believe OMC to be culpable.

The trial court granted OMC's motion *in limine*, stating that these motions were to be interpreted narrowly. The court admonished counsel to bring to its attention any additional problems which may come up with respect to the court's ruling on the motion *in limine*.

Chubb was the first to introduce Joss' consumption of alcohol at trial in the presence of the jury. In his opening statement, counsel for Chubb brought that subject up twice. Chubb's counsel first told the jury that "David had a drink, a Bloody Mary, half of which was spilled." Later in opening statement, Chubb's counsel stated that boats are operated by people who are "probably not being as careful as they might be on certain other circumstances, and very often, yes, involving operators or others who may have brought a can of beer or something else onto the boat for purposes of the fun that they were going to have that day." Chubb's attorney also admitted that David Joss was negligent in his operation of the boat. OMC did not mention Joss' alcohol consumption in its opening statement.

In the direct examination of Joss, Chubb's counsel again raised that subject.

> "[PLAINTIFFS' COUNSEL]: Did you have any of the Bloody Mary?

[DAVID JOSS]: Yes, I did.

Q. Tell the jury what you had, how much you consumed.

* * *

Q. You indicated that at approximately 10:00 or 10:30 you had about a half of an 8-ounce glass of a Bloody Mary, is that correct?

A. That is correct.

Q. Between that time and the time of the accident did you have another single drop of anything else to drink?

A. Not alcohol."

On cross-examination, counsel for OMC asked Joss whether he had seen his father consume alcohol on previous occasions as a passenger. He also asked him whether he had seen his father use alcohol when operating the boat. Chubb's counsel objected to each of these questions, which the judge sustained, each time instructing the jury to disregard them. Counsel for OMC was then permitted to ask Joss, over Chubb's objection, "[D]id you use alcohol in the presence of your father while you were operating the boat?" Joss answered that it was not uncommon for alcohol to be on the boat, but that he could not recall a specific instance where he was drinking when he was driving and his father was a passenger.

Counsel for Chubb pursued the issue of alcohol consumption with McElroy.

"Q. What did you get at the store?

A. Bloody Mary mix. And that's all I remember.

* * *

Q. Who actually mixed [the drinks]?

A. I don't remember. After reading my deposition, I said that Kathy [Faul] did it.

* * *

Q. Do you remember *** how much David Joss had to drink?

A. No.

* * *

Q. Did [Joss] appear impaired to you in any way?

A. No, he did not."

On cross-examination, OMC's counsel also asked about Joss' alcohol consumption.

"Q. [Y]ou had some Bloody Marys out on the lawn, is that correct?

A. Correct.

\* \* \*

Q. Do you recall whether or not Joss had any beer on the boat?

A. No, I don't."

At trial, the only occurrence witness presented by OMC was Michael Gallagher. Gallagher, an experienced water-skier, testified that he skied every other weekend during the summer months and had operated a boat in excess of 100 hours. On the date of the accident, Gallagher stated that while sitting about five feet from the water he first noticed Faul, skiing from right to left at a distance of 100 to 150 feet from shore. He saw her fall and noticed that the boat which was pulling her started to come back for her, but he then looked away and did not see the boat turn. He stated that he could not tell how far away the boat was from the skier when he again noticed the boat coming towards the skier. Gallagher stated that the boat was approaching the skier at a fast rate of speed on a plane, gliding over the water. At this point, Gallagher stated he could not tell if the boat was going to one side of Faul or the other. Gallagher stood up as the boat reached the skier because he was "just anxious" and "getting nervous" about its speed. When the bow of the boat reached the skier, he lost sight of her. According to Gallagher, the last maneuver the boat executed was a hard turn to its right.

OMC also called several expert witnesses who testified to the speed of the boat. Don Kueny testified that the "planing speed," the velocity at which a boat no longer displaces water but glides over it, of the Josses' boat was between 16 and 20 miles per hour. OMC also called Dr. Albert Burstein, who testified that, based on the nature and extent of Faul's injuries, the boat was going between 12 and 15 miles per hour at the time it collided with Faul. Earlier, during the plaintiff's presentation of evidence, Chubb called its expert, who testified that, based on the injuries and lacerations suffered by Faul, the boat was travelling less than five miles per hour at the time of the accident.

In closing arguments, Chubb's counsel raised the issue of Joss' alcohol consumption again and argued that OMC knew that the boat "would be used in the area of people who may be having alcohol, may be taking a can of beer onto the boat for a good time, and oh, yes, used by people, people who are human and people who make mistakes, foreseeable mistakes." The only mention of alcohol in OMC's closing argument was that Joss had half a Bloody Mary.

In his closing argument, counsel for OMC made the following statement, which Chubb contends on appeal to have been erroneously permitted:

"What, now does the insurance company say? They look around. 'Is there somebody that we can sue to get our money back?' And that's where OMC comes in. OMC made the motor. So OMC gets sued in this case by Chubb and Home, not by Kathleen Faul, by Chubb and Home, because Chubb and Home wish to get back from us the moneys that they were called upon under their contract of insurance with the Josses to pay out and for which they received a premium."

Chubb's counsel waited until 1½ to 2 minutes after this statement was made before he objected to this statement. During the interval between the statement and the objection, OMC's counsel argued that Joss' father had negligently entrusted the boat to his son as he did not properly instruct or insure the competency of his son as a boat operator before allowing him to use the boat. OMC's counsel next stated that Chubb's argument needed to be examined and he proceeded to speak in a third person as the boat operator, blaming the accident on the operation of the motor. At this point, counsel for Chubb first registered a general objection without identifying the portion of the argument to which its objection related. That objection was overruled and this ruling is now assigned as error.

On July, 26, 1989, the jury returned a verdict in favor of OMC. Chubb filed a post-trial motion for a judgment notwithstanding the verdict or in the alternative for a new trial, which was denied on November 28, 1989. On December 18, 1989, Chubb filed a notice of appeal, appealing the order entering the judgment on July 26, 1989, and the November 28, 1989, order denying its request for a judgment notwithstanding the verdict.

With leave of court, OMC filed a late notice of cross-appeal, appealing the pretrial orders of April 8, 1986, granting Chubb's motion for reform of the release, and August 22, 1986, denying OMC's motion to dismiss Chubb's third-party complaint. OMC argues in its cross-appeal that the respective orders allowing reformation of the release and denying its motion to dismiss should be reversed because the mistake in the original release was not the result of a mutual mistake between the parties, but rather was a unilateral mistake of law on the part of Chubb's attorneys. Accordingly, OMC contends that Chubb's complaint should have been dismissed because the release originally failed to discharge OMC as required by section 2(d) of the Contribution Act. Additionally, OMC claims that the third-party complaint was not timely filed for two reasons. First, OMC contends that the complaint was not filed within the two-year statute of limitations period contained in section 13—213(d) of the Illinois Code of Civil Pro-

cedure. (Ill. Rev. Stat. 1989, ch. 110, par. 13—213(d).) OMC then argues that the complaint was untimely because even though the third-party complaint was filed on October 10, 1984, two days before Faul's action was formally dismissed, it was not filed during the pendency of the original action since, in effect, the action ended when the settlement was reached on October 10, 1984, prior to the filing of the complaint.

OPINION

On appeal, Chubb first contends that the trial court erred in denying its motion *in limine* to exclude the evidence of David Joss' alcohol consumption on the grounds that the evidence was insufficient to establish impairment. OMC responds that Chubb has waived this issue by failing to specifically object when the evidence of David Joss' alcohol consumption was presented by OMC. Further, OMC contends that Chubb invited this error by introducing the evidence during its direct examinations of David Joss and Peggy McElroy prior to OMC ever raising this issue. In the alternative, OMC contends that the evidence of what was consumed, together with Gallagher's testimony as to the driver's conduct, is sufficient to establish such impairment. In particular, OMC relies on Gallagher's testimony that the boat was planing when approaching Faul and that it turned hard to the right as the type of bizarre or unusual driving patterns sufficient to establish intoxication.

■ The case law in Illinois is clear. When a motion *in limine* is denied, "the unsuccessful movant is left with the procedure of specifically objecting to the evidence when it is offered at trial." (*Cunningham v. Millers General Insurance Co.* (1992), 227 Ill. App. 3d 201, 206, 591 N.E.2d 80; *Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 359 N.E.2d 752.) This objection must be made when the evidence is offered at trial or the right to raise this issue on appeal is waived. *Gonzalez v. Prestress Engineering Corp.* (1990), 194 Ill. App. 3d 819, 551 N.E.2d 793; *County of Cook v. Colonial Oil Corp.* (1958), 15 Ill. 2d 67, 75, 153 N.E.2d 844 ("experienced counsel cannot take a chance of failing to make objections and then, upon receiving what they consider an adverse jury verdict, claim error").

■ Courts have consistently held that orders *in limine* are interlocutory in nature and are subject to reconsideration by the trial court throughout the trial. (*Cunningham*, 227 Ill. App. 3d at 205; *Romanek-Golub & Co. v. Anvan Hotel Corp.* (1988), 168 Ill. App. 3d 1031, 522 N.E.2d 1341.) This flexibility allows the court to interpret and make

any necessary corrections to its order *in limine* during trial. (*Cunningham*, 227 Ill. App. 3d at 205; *Crawford County State Bank v. Grady* (1987), 161 Ill. App. 3d 332, 514 N.E.2d 532.) Furthermore, proper and timely objections allow a reviewing court to benefit from a trial court's interpretation of its order. (*Beasley v. Huffman Manufacturing Co.* (1981), 97 Ill. App. 3d 1, 5, 422 N.E.2d 241.) As Chubb failed to follow this established procedure by objecting at trial when the evidence was actually offered, it cannot raise this issue on appeal.

▮ Here, not only did Chubb fail to object, it was the first to introduce the evidence in question, albeit defensively. A party cannot complain of evidence which he himself introduced or brought out. (*Romanek*, 168 Ill. App. 3d at 1040; *Doria v. Costello* (1974), 22 Ill. App. 3d 505, 512, 318 N.E.2d 40 (plaintiff cannot be heard to complain that evidence of his alcohol consumption was admitted as his counsel initiated the inquiry into such consumption).) The case of *Reid v. Sledge* (1992), 224 Ill. App. 3d 817, 822, 587 N.E.2d 1156, is on point. In that case, the court held that the plaintiff did not preserve the issue of whether the trial court erred in denying his motion *in limine* which attempted to bar evidence that the decedent's son had undergone a sex-change operation. The court stated that the plaintiff was precluded from raising this issue on review because he failed to object to the evidence when offered at trial and had, in fact, introduced the evidence at trial himself. *Reid*, 224 Ill. App. 3d at 822.

Chubb relies on one Texas case, *McCardell v. Hartford Accident & Indemnity Co.* (Tex. Ct. App. 1962), 360 S.W.2d 831, for the proposition that once a motion *in limine* is denied, the party which had attempted to suppress the evidence may introduce it because "it is better from a party's standpoint that the information came out on direct examination rather than cross-examination." (360 S.W.2d at 835.) Chubb, however, overlooks the fact that in its review of the appellate court decision, the Texas Supreme Court stated in *Hartford Accident & Indemnity Co. v. McCardell* (Tex. 1963), 369 S.W.2d 331, that "[i]f a motion *in limine* is overruled, a judgment will not be reversed unless the questions or evidence were *in fact* asked or offered. If they were *in fact* asked or offered, an *objection made at that time is necessary to preserve the right to complain on appeal* that such questions asked or such evidence tendered were so prejudicial that the mere asking or tendering should require a reversal." (Emphasis added.) (369 S.W.2d at 335.) Consequently, the plaintiff's reliance on the appellate court's decision in *McCardell* is misplaced in light of the Texas Supreme Court's statement, which is consistent with Illinois law, that

an objection when the evidence is offered is necessary to preserve the issue on appeal.

Chubb's position that it can use evidence it attempted to exclude solely because its motion *in limine* was denied completely disregards the interlocutory nature of a motion *in limine*. At trial, OMC never mentioned alcohol in its opening statement and never brought up the topic in its case in chief. OMC merely touched on a subject in cross-examination that Chubb raised on direct. Chubb's own trial strategy set the trial court's order *in limine* in stone, forcing the issue into the case and preventing, in a practical sense, any interpretation or modification of the order during trial.

If Chubb's position were followed, Chubb, and other litigants similarly situated, would have a ready-made error on appeal without the trial court ever having the opportunity to reconsider its rulings on motions *in limine*, even if the opposing party never chose to introduce the objectionable evidence at trial. While Chubb may have exercised sound trial strategy in attempting to blunt the impact of the evidence, such actions simply do not properly preserve the issue for review on appeal. See *Doria*, 22 Ill. App. 3d at 510, 512 (in *dicta*, court stated that plaintiff's counsel could not bring as error the admission of plaintiff's alcohol consumption when plaintiff introduced the evidence, apparently as a matter of trial strategy).

Consequently, after examining both the *Romanek* line of cases and *McCardell*, we conclude that Chubb has waived this issue for purposes of appeal as any other result would significantly dilute the interlocutory nature of the motion *in limine* which decisional law has sought to protect. (*Cunningham*, 227 Ill. App. 3d at 205-06.) But see *People v. Spates* (1979), 77 Ill. 2d 193, 395 N.E.2d 563, to which neither of the parties have referred. There, the court held that a criminal defendant could introduce his prior conviction on direct examination after his motion *in limine* to exclude such conviction was denied and still preserve the issue for appeal. However, the Illinois Supreme Court in *Spates* limited its holding to "the precise facts" of that case, namely the use of prior convictions for impeachment purposes to discredit a witness.

Moreover, even if we chose to extend the *Spates* rationale to include any use of challenged evidence by the party who loses a motion *in limine* where such use was motivated by a desire to blunt the impact of such evidence, we would find that the trial court did not abuse its discretion in allowing the jury to hear evidence of Joss' alcohol consumption. This conclusion is not inconsistent with the principles governing the admissibility of such evidence.

■ The general rule governing the admissibility of evidence pertaining to the consumption of alcohol is that such evidence may not be introduced unless actual intoxication can be proven. (*Marshall v. Osborn* (1991), 213 Ill. App. 3d 134, 571 N.E.2d 492; *Bohnen v. Wingereid* (1979), 80 Ill. App. 3d 232, 398 N.E.2d 1204.) A party is required to show supporting evidence of actual impairment of physical or mental capabilities. *Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 914, 410 N.E.2d 249.

The supporting evidence must reveal some "act, action, conduct, appearance, observation, or circumstance *** [which] either directly or by reasonable inference, [demonstrates] that the conduct of the individual at and before the accident was or may have been affected by the use of alcoholic beverages." (*Shore v. Turman* (1965), 63 Ill. App. 2d 315, 323, 210 N.E.2d 232.) This evidence must show impairment "with the resultant diminution in the ability to think and act with ordinary care." (*Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 575, 573 N.E.2d 1315.) The evidence of impairment can be shown directly through testimony of the person drinking (*Matkins v. Fenorsky* (1952), 348 Ill. App. 125, 108 N.E.2d 373), or circumstantially, through opinion testimony of a person who observed the subject's intoxication (*Doria*, 22 Ill. App. 3d at 510), expert testimony (*Marshall*, 213 Ill. App. 3d at 141), or through evidence of erratic behavior such as bizarre or unusual driving patterns (*Bohnen*, 80 Ill. App. 3d at 237).

Joss testified that he consumed one-half of a Bloody Mary and could not affirmatively state that he did not consume any beer while on board the boat. Courts have consistently held that there is "no arithmetic calculation from the drinks consumed [which] can establish whether a particular person was impaired." (See, *e.g., Bohnen*, 80 Ill. App. 3d at 237.) As the court stated in *Kitten v. Stodden* (1966), 76 Ill. App. 2d 177, 221 N.E.2d 511, "Intoxicating beverages affect different persons in different ways and some persons would be intoxicated by the consumption of the same quantity of intoxicating beverages that the plaintiff consumed, but the consumption of a similar amount by other persons would have no effect." (76 Ill. App. 2d at 181.) As such, even the consumption of one alcoholic beverage, coupled with sufficient erratic behavior, has been considered sufficient to create a genuine issue of material fact. *Knief v. Sotos* (1989), 181 Ill. App. 3d 959, 537 N.E.2d 832 (holding that a genuine issue of material fact existed as to whether driver was intoxicated when driver had one drink, caused an accident by failing to swerve to avoid a fallen bicy-

clist in the road and emitted the odor of alcohol immediately after the accident).

■■ Here, the supporting evidence reveals actions on the part of Joss which allow a reasonable inference to be drawn that his conduct at and immediately before the accident may have been affected by the use of alcoholic beverages. (*Shore*, 63 Ill. App. 2d 315, 210 N.E.2d 232.) The testimony of Gallagher, a disinterested witness, established that Joss headed the boat right at Faul, who was in a very vulnerable position. As it headed towards Faul, the boat was planing, which according to one expert would indicate a travelling speed of between 16 and 20 miles per hour. The boat continued at this speed even when it was less than five seconds away from Faul. Moreover, the last maneuver executed by Joss, the sharp turn to the right, was made in the immediate vicinity of Faul.

We agree with Chubb that merely driving at excessive speeds or the mere fact of involvement in an accident are not necessarily indicative of impairment. (See *Rose v. Brozman's Tavern, Inc.* (1981), 102 Ill. App. 3d 1087, 1091, 430 N.E.2d 282; *Clay v. McCarthy* (1979), 73 Ill. App. 3d 462, 467, 392 N.E.2d 693.) However, in this case, the fact that Joss drove the boat at an excessive rate of speed directly at Faul, while heading purposefully in her direction, ostensibly to help her, and that he turned sharply while in close proximity to her can evidence impairment insofar as it reflects an inexplicable disregard for Faul's safety. Such actions, particularly for an experienced boat operator, if believed by the trier of fact to have occurred present proof beyond mere miscalculation or judgmental error and would allow the admission of evidence pertaining to Joss' alcohol consumption. (See *Knief*, 181 Ill. App. 3d at 964.) There, the court held that notwithstanding that the driver was shown to have consumed only one drink, an issue of fact as to intoxication was present where evidence also showed that the driver's automobile ran over a fallen cyclist after the car in front of hers swerved broadly to avoid such impact. The court stated that the evidence that the first car swerved broadly could support an inference that the driver of the second car was intoxicated as she did not follow the first driver's lead. (*Cf. Bohnen*, 80 Ill. App. 3d at 238 (fact that car, "with no apparent explanation," crossed over two lanes of traffic and an eight-foot tumble strip and collided with another car head on was sufficient evidence of unusual driving to admit evidence of driver's drinking).) Consequently, we cannot say that in light of the evidence of Joss' alcohol consumption and of the erratic fashion in which Joss operated the boat that the trial court abused its discretion in admitting this evidence.

We also note that the issue of intoxication pertains only to the question of damages since it affects only the percentage of OMC's contribution to the injuries. Here, the jury found that there was no liability by OMC. Thus, the issue of intoxication was not reached in the jury's determination. (Accord *Kramer v. J.I. Case Manufacturing Co.* (1991), 62 Wash. App. 544, 815 P.2d 798 (improper admission of evidence of plaintiff's prior alcohol and drug use was not sufficient basis for reversal of jury verdict finding defendant manufacturer not liable when such evidence was relevant only to damages, an issue which the jury did not reach); *cf. Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 294 N.E.2d 689 (unnecessary to reach alleged errors, raising issue of surviving spouse's remarriage during *voir dire* and remarks in closing argument on the extent of damages, on appeal when the jury having found the defendant not liable, never reached the question of damages); *Werthman v. General Motors Corp.* (1990), 187 Mich. App. 238, 466 N.W.2d 305 (admission of hospital records which included blood alcohol level of decedent in action did not constitute reversible error where jury's verdict indicated it found no design defect in defendant's product).) Moreover, since this action was brought by Chubb in its own name as subrogee of Joss, we cannot conclude that the question of Joss' intoxication was so prejudicial as to pervade the liability issue even though its relevance was only to damages. *Cf. Walters v. Lincoln Electric Co.* (1990), 197 Ill. App. 3d 920, 557 N.E.2d 208.

■ Chubb next contends with respect to the issue of alcohol consumption that the cross-examination of David Joss regarding his consumption of alcohol on prior occasions was improper because it went beyond the scope of direct examination. This contention refers to the question asked of Joss concerning his own prior alcohol consumption on the boat in the presence of his father. Joss testified on direct examination about his past training and experience in learning to operate the vessel. On cross-examination, it was established that, at least in part, this training was under his father's tutelage. Consequently, at least superficially, the question concerning his prior consumption of alcohol while on the boat in the presence of his father was not totally beyond the scope of his direct examination. To the extent, however, that the specific fact that he was trained by his father was established only on cross-examination, the trial judge would have been within the limits of his discretion had he sustained the objection to the question of Joss' prior consumption. Nevertheless, we cannot say that the denial of the objection constituted an abuse of discretion.

Moreover, even if this question was beyond the scope of direct examination, the elicited response did not rise to the level of prejudicial error. As previously noted Joss' response to that question was that having alcohol on the boat was not uncommon, but that he could not recall a specific instance wherein he consumed alcohol in such circumstances. Thus, the response does not disclose any alcoholic consumption or impairment on Joss' part on any such prior occasions. Moreover, the mere presence of alcoholic beverages on the boat would not by itself be prejudicial. Arguably, it would be a matter of common knowledge that alcohol could be kept on a boat for consumption by its passengers.

■ Chubb's argument next concerns remarks made by OMC's counsel in closing arguments. Specifically, Chubb complains of OMC's reference to the fact that the suit against OMC was brought by Chubb, not by Kathleen Faul. Chubb contends that this remark implies that Faul chose not to sue OMC because she did not think OMC was at fault. According to Chubb, this improper reference "tended to undermine and negate the entire basis upon which any subrogation action is based."

At the outset, we agree with OMC that Chubb has waived this argument by failing to timely object to the remark during closing arguments. (*County of Cook v. Colonial Oil Corp.* (1958), 15 Ill. 2d 67, 153 N.E.2d 844.) Chubb's contention that it did object during closing argument is not persuasive. Chubb did not object until well after the remark was made. In the 1½ to 2 minutes between the remark and objection, OMC's counsel argued that David Joss' father had negligently entrusted the boat to his son, had not properly instructed his son, and that OMC's motor was not liable for Faul's injuries. For the court to sustain an objection which refers back to a much earlier portion of a summation, or for that matter an opening statement, could prove unduly disruptive and confuse the jury. Likewise, if the error could be cured, an attempt to backtrack in order to do so would be unduly cumbersome. (*Cf. Village of Park Forest v. Walker* (1976), 64 Ill. 2d 286, 356 N.E.2d 42; *Duffy v. Midlothian Country Club* (1985), 135 Ill. App. 3d 429, 481 N.E.2d 1037 (failure to object at the time of the argument waives question for purposes of review).) We also note that although not argued by the parties, the objection which was ultimately made was a general one and, as such, was not sufficient to preserve any error. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §103.2, at 6-7 (4th ed. 1984).

Even if Chubb had not waived this issue, the remark does not appear to warrant reversal. The determination of prejudicial impact

made by arguments or remarks of counsel is within the sound discretion of the trial court. (*Oak Brook Park District v. Oak Brook Development Co.* (1988), 170 Ill. App. 3d 221, 524 N.E.2d 213.) The trial judge's finding will not be disturbed on review absent a clear abuse of discretion. *Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 479 N.E.2d 1091.

First, as previously stated, the remark does correctly state that OMC was being sued by Chubb, and not by Kathleen Faul, a fact that the jurors were aware of throughout the trial. Second, the trial in this case lasted for three weeks during which time the jury heard extensive, technical testimony from numerous expert witnesses on the feasibility or impracticality of various propeller guards. This statement was uttered during the course of a closing argument lasting 45 minutes to 1 hour which dealt almost exclusively with the issues of OMC's liability and the impracticality of the propeller guard. This statement was not repeated or stressed in any way, thus limiting any possible prejudice. (*Ferry v. Checker Taxi Co.* (1987), 165 Ill. App. 3d 744, 751, 520 N.E.2d 733.) Considering these factors, this single remark could not have had a significant impact and does not require a new trial.

Chubb contends that the motion *in limine* barring mention that Faul's attorney had represented OMC on previous occasions prevented it from adequately responding to the assertion made by OMC's counsel that Faul did not bring suit against OMC. However, since the remark in question did not rise to level of prejudicial error, prejudicial error could not have arisen when Chubb was prevented from responding to the contention that Faul did not join OMC as a defendant by OMC's motion *in limine*.

In sum, we hold that Chubb did not properly preserve the issue of David Joss' alcohol consumption for review and that Chubb has waived the propriety of defense counsel's remarks during closing arguments by failing to timely object to the remarks at trial. We note that even if plaintiff had properly preserved the issue of OMC's remarks in closing arguments for appeal, the remarks do not constitute reversible error. In light of our holding, we need not reach the issues raised by the defendants' cross-appeal concerning the allegedly improper reformation of the release and the timeliness of the filing of Chubb's third-party complaint.

Judgment affirmed.

LORENZ and MURRAY, JJ., concur.